KENNETH E. AND ANITA L. RICHARDS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Richards v. Commissioner
Docket No. 1544-71.
United States Tax Court
T.C. Memo 1976-53; 1976 Tax Ct. Memo LEXIS 353; 35 T.C.M. (CCH) 237; T.C.M. (RIA) 760053; February 26, 1976, Filed Kenneth E. Richards, pro so. [1]
Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, *354 Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. The parties have filed no exceptions of law or fact to Special Trial Judge Caldwell's report. The Court agrees with and adopts his opinion which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case was one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers (Lockheed Air Service Company and Dynalectron Corporation) and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined a deficiency in petitioners' 1969 Federal income taxes in the amount of $123.02. The only issue for decision is whether all or any portion of $657 which petitioner Kenneth Richards (hereinafter, "petitioner") received from Dynalectron Corporation (hereinafter, "Dynalectron") should *355 be included in his gross income for 1969 under section 61(a)(1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct any or all of said amount of per diem as away-from-home traveling expenses under section 162(a)(2). FINDINGS OF FACT The office of the Internal Revenue Service with which petitioners filed their 1969 return is not established by evidence in the record; nor is the location of their residence at the time they filed their petition in this case. During 1969, petitioner was employed as a field team member by Dynalectron. That corporation, as well as Lockheed Air Service Company (hereinafter, "Lockheed"), had a contract with the United States Air Force to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support systems. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three *356 fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station *357 to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion *358 of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected *359 field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee *360 who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the *361 performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective *362 of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was newly hired by Dynalectron on October 1, 1969, and *363 assigned to Key Field at Meridian, Mississippi. He remained at Meridian for the remainder of 1969, throughout 1970, and until February 12, 1971, when he was transferred to San Antonio, Texas. At the time he was hired, petitioner certified to Dynalectron that his actual residence (fixed or permanent domicile) was at 901 N. Wilhite, Cleburne, Texas. Cleburne was the place of petitioner's birth; and he and Mrs. Richards worked in the general area including Cleburne during part of 1969. The record does not contain any evidence respecting petitioner's ties with Cleburne during 1969, the taxable year involved, after his employment by Dynalectron and his assignment to Meridian. Dynalectron paid petitioner $657 of per diem in 1969. He did not include any of that amount in gross income on his 1969 return. In his statutory notice of deficiency, respondent included said amount in petitioner's gross income for 1969, under section 61(a)(1). OPINION It must first be determined whether the per diem payments received by petitioner from Dynalectron in 1969 are includible in his gross income for that year. It is believed that the per diem payments when received by petitioner constituted gross *364 income. In very broad and sweeping language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's 1969 gross income the per diem payments he received in that year. Leo C. Cockrell,38 T.C. 470, 477-478; affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct any part or all of the per diem payments under section 162(a)(2) as expenses for travel while away from home in pursuit *365 of his trade or business as an employee of Dynalectron. Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court, in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses. The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties are apart only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). *366 In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points are thus presented: Was petitioner's assignment to Meridian temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses. The evidence received through the so-called "master witnesses," which applies to all cases in the group of 37 which were consolidated, suffices to bring conviction that petitioner's three-month assignment to Meridian in 1969 should be treated as a temporary one. Viewed from the vantage point of December 31, 1969, it is not believed that such then-brief assignment had at that point been transformed *367 into an indefinite one. On the second point, though, petitioner must lose for failure of proof. Petitioner was one of nine of the 37 petitioners whose absence at the trial was excused, with his testimony to be taken through answers to written interrogatories propounded to him by his counsel and to cross-interrogatories propounded to him by counsel for the respondent. Petitioner did answer the interrogatories, and they were returned to the Court and filed. However, he did not sign or return the cross-interrogatories propounded and sent to him by counsel for respondent. The respondent, in those circumstances, moved to have the interrogatories and petitioner's answers thereto expunged from the record; and that motion was granted. The result is that petitioner, who has the burden of proof to establish that he had, during the time of his Meridian assignment, two places of abode and incurred additional and duplicate living expenses if he is to be granted the deduction that would offset the inclusion of the per diem in income, has totally failed to carry that burden. Evidence introduced through the "master witnesses" will establish that petitioner certified to Dynalectron Cleburne, Texas, *368 was his home, that it was his birthplace, and that he and Mrs. Richards worked in the Fort Worth, Texas, area (Cleburne is approximately 30 miles south of Fort Worth) at some time during 1969. But there is no evidence to establish that he maintained any abode at Cleburne after he went to work for Dynalectron in Meridian and incurred additional and duplicate living expenses as a result of having two places of abode. Petitioner should not be entitled to any deduction for away-from-home traveling expenses under section 162(a)(2) for 1969. * * * * *
In accordance with the foregoing, Decision will be entered for the respondent.
Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.